UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00931-CRS

**BRIAN S. FORD**                                                    **PLAINTIFF**

**VS.**

**ANDREW M. SAUL,**
*Acting Commissioner of Social Security*                            **DEFENDANT**

## REPORT AND RECOMMENDATION

The Commissioner of Social Security denied Brian S. Ford's applications for supplemental security income benefits and disability insurance benefits. Ford seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Ford filed a Motion for Summary Judgment (DN 13), and the Commissioner has filed a Fact & Law Summary (DN 20). The District Judge referred this case to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) to prepare a Report and Recommendation. (DN 12).

### I. Findings of Fact

Brian S. Ford ("Ford") is in his early 40s, graduated from high school, and lives with his wife and two children. (Tr. 49). His last employment was at Recover Care, taking orders for hospital equipment. (Tr. 58-59). He claims he was let go after making several mistakes. (*Id.*). Ford states he cannot work because his anxiety is too bad. He claims he hears voices that insult him and cause him to get confused. (Tr. 77). When the voices are "good" they are "like whispering or like a T.V. or a radio in the other room" but when they are "bad, it's screaming and yelling." (Tr. 79). Medication helps a little bit, but he still has problems. (Tr. 57). Being around a lot of people triggers his anxiety and causes his heart to start beating quickly. (Tr. 73-74). Despite this alleged reaction, he has attended several large events over the past year, including the State Fair and a political rally.

(Tr. 74). He states that he leaves the house about five times a week. (Tr. 69).

Ford also claims he has issues with his hands and feet. He struggles with buttoning his clothing (Tr. 51) and can only use a keyboard on his computer for a little while before his fingers start going numb and tingling. (Tr. 52). But Ford also states that he is able to help around the house, by taking out the garbage, loading the dishwasher, folding and putting away laundry, and making the bed. (Tr. 51).

Ford originally filed an application for disability insurance benefits ("DIB") under Title II on May 13, 2013, alleging disability beginning on May 3, 2012. (Tr. 99). This application was denied initially and on reconsideration. (*Id.*). After holding an administrative hearing, ALJ Roland D. Mather ("ALJ Mather") issued an unfavorable decision on July 24, 2014. (Tr. 99-112). Because it does not appear that Ford appealed that decision, the July 2014 denial is considered final for that time period.

Ford again applied for DIB on September 29, 2016 (Tr. 292) and for supplemental security income benefits ("SSI") under Title XVI (Tr. 296), alleging he became disabled on July 26, 2014. He alleged disability due to schizophrenia, anxiety, diabetes, depression, neuropathy, and back pain. (Tr. 318). His applications were denied initially (Tr. 117-135; 136-154) and again on reconsideration (Tr. 158-180; 181-203). Administrative Law Judge Jerry Lovitt ("ALJ Lovitt") conducted a hearing in Louisville, Kentucky on October 26, 2018. (Tr. 42-44). Ford attended the hearing with his attorney. (Tr. 42). An impartial vocational expert testified at the hearing. (*Id.*). ALJ Lovitt issued an unfavorable decision on January 8, 2019. (Tr. 15-34).

ALJ Lovitt applied the traditional five-step sequential analysis promulgated by the Commissioner, 20 C.F.R. § 404.1520, *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010), and made the following findings.

First, Ford has not engaged in substantial gainful activity since July 26, 2014, the alleged onset date. (Tr. 18). Second, Hill has the severe impairments of: degenerative disc disease, peripheral neuropathy, obesity, depression, anxiety, atypical psychosis, panic disorder, and schizoaffective disorder. (*Id.*). Third, none of Ford's impairments or combination of impairments meets or medically equals the severity of a listed impairment from 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (Tr. 19-20). Between steps three and four, ALJ Lovitt found that Ford has the residual functional capacity ("RFC") to perform light work except that Ford:

> can perform occasional climbing of ramps/stairs, and occasional balancing, stooping, kneeling and crouching. We can perform occasional pushing of foot controls with the bilateral lower extremities. He can never crawl, and cannot climb ladders, ropes or scaffolds, and he can have no exposure to unprotected heights, and no exposure to workplace hazards such as dangerous machinery with moving parts that fail to stop when human contact is lost. He cannot perform any driving, and can perform no operation of heavy machinery or drivable workplace equipment such as a forklift, scissor life or a pallet jack. He can have no more than occasional exposure to vibration, and to no more than moderate levels of noise as defined in Appendix D of the Selective Characteristics of Occupations (SCO). He is able to understand, remember and carry out simple, routine instructions; and is able to sustain concentration for completing simple, repetitive, and routine tasks. He can use judgment in making simple work-related decisions consistent with this type of work, and requires an occupation with an established routine and set procedures involving few changes during workday. He cannot perform any fast-paced production line, assembly line, or quota driven work, and cannot perform tandem tasks. He would require work where the supervisor communications instructions verbally or by demonstration, and he can have occasional contact with supervisors and co-workers, and no contact with the general public. He will be off-task for no more than 10% of the workday in addition to normally scheduled breaks, and will miss no more than one day of work per month.

(Tr. 23). Within his RFC determination, ALJ Lovitt cited to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), which holds that absent evidence of improvement or deterioration in a claimant's condition, a subsequent ALJ's decision is bound by the findings of a previous ALJ. (Tr. 31). ALJ Lovitt concluded the current record contained new and material evidence that justified altering ALJ Mather's previous RFC findings. (*Id.*). Specifically, ALJ Lovitt considered

the long passage of time and significantly different medical evidence attained since ALJ Mather's decision. (*Id.*). This new and material evidence detailed the presence of spine degeneration, which ALJ Lovitt now considers a severe impairment. (*Id.*).

Fourth, ALJ Lovitt found that Ford could not perform any of his past relevant work. (Tr. 32). Fifth and finally, considering Ford's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. (*Id.*).

ALJ Lovitt concluded that Ford was not under a disability, as defined in the Social Security Act, from July 26, 2014, through January 8, 2019, the date of his decision. (Tr. 33-34). Ford appealed ALJ Lovitt's decision. (Tr. 213). The Appeals Council declined review. (Tr. 1). At that point, the denial became the final decision of the Commissioner, and Ford sought judicial review from this Court. (DN 1).

## II. Standard of Review

When reviewing the administrative law judge's decision to deny disability benefits, the Court may "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). Instead, the Court's review of the administrative law judge's decision is limited to an inquiry as to whether the administrative law judge's findings were supported by substantial evidence, 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (citations omitted), and whether the administrative law judge employed the proper legal standards in reaching her conclusion. *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence exists "when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir. 1993). The Supreme Court has clarified

4

that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high[.]" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted).

### III. Conclusions of Law

#### A. Listing 12.03

Ford argues that ALJ Lovitt's determination that his condition did not meeting Listing 12.03 is not supported by substantial evidence. (DN 13). At the third step of the ALJ's analysis, the claimant has the burden to show that his or her impairment meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P. App'x 1. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Each listing identifies "the objective medical and other findings needed to satisfy the criteria of that listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)). "A claimant must satisfy all of the criteria to 'meet' the listing." *Id.*

Listing 12.03 for "Schizophrenia" and "other psychotic disorders" is met when the requirements of either Paragraphs A and B or the requirements of Paragraphs A and C of the Listing are satisfied. 20 C.F.R. Pt. 404 Subpt. P. App's 1, § 12.03. Paragraph A pertains to the claimant's medically documented health symptoms and requires he show "[m]edical documentation" of one or more of the following:

1. Delusions or hallucinations;
2. Disorganized thinking (speech); or
3. Grossly disorganized behavior or catatonia.

Paragraph B describes four functional areas and requires a claimant to show he has extreme limitation in one area or marked limitations in two of the following areas:

1. Understand, remember, or apply information.
2. Interact with others.
3. Concentrate, persist or maintain pace.
4. Adapt or manage oneself.

And, lastly, Paragraph C evaluates the claimant's ability to function independently and/or handle changes in the environment. This Paragraph requires the claimant demonstrate a mental disorder that is "serious and persistent" by proving a medically documented history of the existence of the disorder over two years and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminished the symptoms and signs of your mental disorder; and
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

At Step Three, ALJ Lovitt found the severity of Ford's mental impairments, singly and in combination, did not meet or medically equal the criteria of Listings 12.03 (schizophrenia and other psychotic disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). (Tr. 20). He then went on to evaluate each of the Paragraph B criteria, concluding that Ford was only moderately limited in each area based on the record evidence. He also concluded that "the evidence fails to establish the presence of the Paragraph C criteria." (Tr. 22). ALJ Lovitt did not mention the Paragraph A criteria.

### i. Paragraph A Criteria

Ford believes ALJ Lovitt implicitly found that he meets the Paragraph A criteria of Listing 12.03 because elsewhere in the opinion ALJ Lovitt found Ford suffers from "depression, anxiety, atypical psychosis, panic disorder, and schizoaffective disorder" and generally acknowledged Ford's hallucinations. (DN 13, at pp. 5-6 (citing Tr. 18, 28)). Ford claims that his treatment records from Centerstone where he voiced consistent complaints of audio hallucinations and Dr. Dennis' findings on examination that Ford had a clear history of psychotic symptoms accompanied by delusions and hallucinations are medical documentation of his meeting the Paragraph A criteria. (*Id.* at p. 5). The Commissioner argues that this evidence does not comprise "medical documentation" but rather consists of Ford's subjective reports of his symptoms. (DN 20, at p. 10).

The Sixth Circuit has made it clear that even if an ALJ's step-three conclusion was cursory, the decision is supported by substantial evidence if "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest v. Comm'r of Soc. Sec.*, 591 F App'x 359, 366 (6th Cir. 2014) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)); *see also Bryant v. Colvin*, No. 3:16CV-00121-DW, 2016 WL 6584917, at *3 (W.D. Ky. Nov. 4, 2016) (finding that despite the ALJ "passing over subsection (2) of Listing 12.04C," the ALJ made sufficient factual findings throughout his opinion to support his finding at step three). In addition, the Sixth Circuit recognizes that any error with respect to the ALJ's step-three analysis is harmless unless the claimant can establish that he satisfied the listing in question. *Forrest*, 591 F. App'x at 366; *see also Chappell v. Comm'r of Soc. Sec.*, No. 1:14-cv-1005, 2015 WL 4065261, at *4 (W.D. Mich. July 2, 2015).

Although the Court agrees that Ford's subjective complaints cannot comprise "medical documentation," ALJ Lovitt made sufficient factual findings elsewhere in his opinion regarding Ford's hallucinations that support Ford meeting the Paragraph A criteria. For instance, ALJ Lovitt repeatedly recognized Ford's auditory hallucinations. In reviewing the Paragraph B criteria, ALJ Lovitt discussed how treatment notes indicated that Ford reported that his "internal stimuli (auditory hallucinations) make it hard to concentrate." (Tr. 22). Later, in his RFC determination, ALJ Lovitt noted that Ford's complaints of hallucinations were contradictory at times. Treatment notes from late 2018 reflected Ford stating that he hears voices in his head that are loud or screaming in nature. (Tr. 28 (citing Ex. B15F, 17)). But most other treatment reports detailed Ford describing the voices as "whispering in nature" or "like a TV in the other room." (*Id.* (citing Ex. B7F, 6, 48-49; Ex B15F, 66-67). And although Ford stated on several occasions that the voices did not give him instructions, Ford testified during his administrative hearing that the voices were

telling him to "leave." (*Id.* (citing Ex. B7F, 50; and Ex. B15F, 67)). Despite these contradictions, ALJ Lovitt goes on to state that Ford's auditory hallucinations began in his late teens and continue to "interfere with concentration." (Tr. 30). Based on this evidence, the Court finds ALJ Lovitt made sufficient findings elsewhere in his opinion supporting Ford meeting the Paragraph A criteria.

Ford, however, still must demonstrate that he meets Paragraphs B and C of Listing 12.03 or that ALJ Lovitt's analysis of this criteria is not supported by substantial evidence in the record.

ii. Paragraph B Criteria

As to the Paragraph B criteria, Ford claims he is markedly limited in: his ability to understand, remember, and apply information, meeting B(1); his ability to interact with others, meeting B(2), and his ability to sustain concentration, persistence, or pace, meeting B(3). He further argues he is markedly to extremely limited in his ability to tolerate stress and the pressure of daily work activities, meeting B(4). A marked limitation means that a claimant's functioning in an area "independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1.

ALJ Lovitt found Ford was only moderately limited in each of those areas. Moderate limitation means the claimant's functioning in the area "independently, appropriately, effectively, and on a sustained basis is fair." *Id.*. As to B(1), understanding, remembering, or applying information, ALJ Lovitt first recognized Ford's complaints of difficulty understanding, remembering, and following instructions. (Tr. 21). But ALJ Lovitt then cited to treatment records from several providers, including First Stop Urgent Care, Baptist Hospital, Centerstone, Seven Counties Services, and Strickland, Cox, and Associates, from September of 2015 to April of 2018, indicating Ford had no memory loss or confusion (Tr. 437, 444, 451-2, 455-56), that his recent and

remote memory were normal (Tr. 472), that he had "no memory problems" (Tr. 658, 695, 1141), and that he was oriented to person, time, and place, able to use decision making strategies, and able to direct his attention (Tr. 1077, 1099). ALJ Lovitt also cited to a treatment record from August of 2016, where Ford described his "short memory problem" where he "forgets things, gets confused . . . can't drive, gets lost, forgets directions, [and] can't cook as he forgets[.]" (Tr. 664). Because he found Ford's episodic confusion "may result in periodic diminishment in cognitive functioning[,]" ALJ Lovitt concluded that moderate limitations to B(1) were supported.

Ford alleges that he is markedly limited in this area based on the Montreal Cognitive Assessment (MCA) diagnosing him with dementia and his complaints to his treating psychologist, Dr. Agrawal, that he has had short-term memory problems for the past three years. (DN 13, at p. 6). Dr. Agrawal's records reflect that in September of 2016, he reviewed Ford's score of 11/30 from the MCA, noting this score was "positive for dementia." (Tr. 674). In these same records, Dr. Agrawal orders lab work to rule out reversible causes of dementia. (*Id.*). Two months later, Dr. Agrawal noted that Ford's "dementia work up labs [were] fine." (Tr. 683). Although Ford's MCA results demonstrate that he has some degree of limitation with his memory, without any elaboration on these test results, this evidence does not demonstrate a marked limitation, where Ford's functioning in this area independently or appropriately is seriously limited.

Because the record overwhelmingly indicated that Ford did not present with memory issues, except for several visits with Dr. Agrawal, ALJ Lovitt's conclusion that he is moderately limited in this area is well-supported by the record. Further, Ford has not carried his burden in citing to evidence establishing a marked or extreme limitation in this category.

As for B(2), Ford's ability to interact with others, ALJ Lovitt again found Ford was moderately limited. ALJ Lovitt noted Ford's reported difficulty getting along with family, friends

and neighbors but also cited to several reports demonstrating that Ford is pleasant and cooperative and citing Ford's wife and children as a good support system. ALJ Lovitt also recalled that during the administrative hearing Ford presented as polite with no communication problems, maintained good eye contact, was pleasant and professional, and gave responsive, well-thought out, and appropriate answers. (Tr. 21).

Ford relies on Dr. Dennis' "well-supported limitations" to argue that he meets B(2). Dr. Dennis, Psy. D. performed a consultative examination of Ford in January of 2017. (Tr. 647). Specifically, Ford references Dr. Dennis' finding that he was markedly limited in his ability to maintain effective social interactions with supervisors, co-workers, and the public. But as ALJ Lovitt concludes later in his decision, Dr. Dennis' marked limitations are not supported by objective medical evidence. The record reflects that Ford has some social limitations but that he is generally able to interact with others effectively. For these reasons, ALJ Lovitt's finding of moderate limitation regarding interacting with others is supported by substantial evidence in the record.

Turning to B(3), ALJ Lovitt concluded that Ford was moderately limited in his ability to sustain concentration, persistence, and pace because although Ford has indicated his difficulty concentrating and completing tasks and treatment reports indicated that his hallucinations make it hard to concentrate and make him easily distracted (Tr. 22 (citing Ex B11E, 7; Ex. B7F, 5, 34, 46; Ex. B15F, 36, 77)), many other reports detailed Ford as having no deficits in concentration or attention span (*id.* (citing B7F, 16, 23, 30, 36, 40, 43; and Ex. B15F, 23, 43)). Ford once more relies on the limitations assigned by Dr. Dennis to argue that he is markedly limited in concentration, persistence, and pace. For the same reasons discussed in evaluating (B)(2), Dr. Dennis' unsupported limitations in this area do not establish that Ford is seriously limited in

functioning independently, appropriately, effectively, or on a sustained basis in this area. Ford has not carried his burden of proving he meets the B(3) criteria, and the ALJ's analysis is supported by substantial evidence in the record.

Lastly, as to B(4), ALJ Lovitt concluded Ford was moderately limited at adapting and managing himself. (Tr. 22). ALJ Lovitt highlighted that Ford reported difficulty with "various aspects of personal care" and that he needed reminders to care for himself and to adhere to his medications. (Tr. 22 (citing Ex. B11E, 3-4)). But ALJ Lovitt also referenced Ford's reports that he can prepare basic meals, perform basic chores, go out alone, and use a computer. (*Id.* (citing B11E, 4-5; Ford's hearing testimony)). ALJ Lovitt pointed out that treatment records corroborate Ford's abilities, finding him capable of performing activities of daily living despite sometimes needing reminders (*Id.* (citing Ex. B7F, 19, 42, 49; Ex. B15F, 66)) and cited to instances of Ford taking his kids to the park and to skating parties as well as caring for three dogs, two of which are fairly large animals (*Id.* (citing B7F, 54; Ex. B11E, 3, Ex. B15F, 73; Ford's hearing testimony)).

Ford makes only passing mention of the B(4) criteria in his brief and does not point to specific evidence he believes would establish marked or severe limitation in this area. He only generally references Dr. Dennis' finding that Ford is extremely limited in his ability to tolerate stress and the pressure of daily work activities. Yet, again, Dr. Dennis' unsupported limitations alone do not establish Ford being markedly or extremely limited in this area. And because Ford did not submit proof of this criteria, the Court finds ALJ Lovitt's comprehensive determination that Ford is moderately limited in adapting and managing himself is supported by substantial evidence in the record.[1]

---

[1] Ford seems to also make a general argument against ALJ Lovitt's finding of moderate limitation as to the B criteria because ALJ Lovitt allegedly rejected Ford's Global Assessment of Functioning score of 46 in his RFC determination but then relied on the GAF score to support his finding of moderate limitations at Step Three. But

iii. Paragraph C Criteria

Ford's final option for establishing that he meets Listing 12.03 requires him to demonstrate he meets all components of Paragraph C. ALJ Lovitt's discussion as to this criteria was brief, stating only that: "[i]n this case, the evidence fails to establish the presence of the 'paragraph C' criteria[.]" He then repeated the requirements of the Paragraph, nothing there is "no serious and persistent medically documented history of a chronic mental disorder of at least 2 years' duration evidencing the following: (1) medical treatment, mental health therapy, psychological support(s) or a highly structured setting(s) that is ongoing and diminished the symptoms and signs of [Ford's] mental disorder; and (2) marginal adjustment, that is [Ford has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life."  (Tr. 22-23).

Ford claims he meets C(1) because he has received extensive mental health treatment and has consistently repeated a desire to return to work as one of his stated goals. (DN 13, at pp. 6-7). He also claims that he meets both the C(1) and (2) criteria because he has attempted many meditation techniques to alleviate the distractions caused by his hallucinatory commands and that his depression, measured by the PHQ-9 test, is "moderately severe." (*Id.*). The Commissioner argues Ford "misunderstands" the requirements in Paragraph C and that there is ample evidence that Ford did not rely on medical treatment or therapy to diminish his symptoms. (DN 20, at pp. 14-15). Instead, the Commissioner points out that Ford reported making "great progress" by learning to quiet or ignore the voices in his head and that he did so by playing guitar at least once a week and further reported that he could return to work if he could quiet those voices. (*Id.*).

The Court agrees with the Commissioner that Ford has not presented sufficient evidence

---

ALJ Lovitt never cites to or relies on any of Ford's GAF scores from his medical records in the Step Three evaluation.

to meet the Paragraph C criteria. While Ford may have expressed a desire to return to work at times, he does not point to medical documentation of at least 2 years' duration evidencing a marginal adjustment to adapt to changes in his environment or to demands in his life. And although the ALJ's evaluation of this criteria was cursory, he outlined evidence elsewhere in his opinion that discounts Ford's claims that he meets either component of Paragraph C. In his RFC determination, ALJ Lovitt discusses that Ford has a psychiatric history involving medication and counseling but that treatment reports in June and August of 2016 indicated he had been making progress by learning to quiet the voices and improving his abilities to manage his anxieties and stressors. (Tr. 28 (citing Ex. B15, 40; Ex. B7F, 93)). ALJ Lovitt, however, also mentioned that treatment reports from late 2018 chronicled worsening symptoms. Ford even confirms that his audio hallucinations have waxed and waned during various treatment regimens. (DN 13, at p. 5). Because records from mid-2016 indicated vast improvement and management of Ford's condition, he cannot demonstrate the two-year-duration requirement for either of the Paragraph C criteria.

For these reasons, ALJ Lovitt's determination that Ford does not meet Listing 12.03 is supported by substantial evidence in the record.

## B. Residual Functional Capacity Determination

Next, Ford makes several challenges to ALJ Lovitt's RFC determination. The residual functional capacity finding is the administrative law judge's ultimate determination of what a claimant can still do despite his physical and mental limitations. 20 C.F.R. §§ 416.945(a), 416.946. The administrative law judge bases his residual functional capacity finding on a review of the record as a whole, including a claimant's credible testimony and the opinions from a claimant's medical sources.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  An ALJ is required to consider every medical opinion in a claimant's case record. 20 C.F.R. 404.1527(b); *see also Walton v.*

*Comm'r of Soc. Sec.*, No. 97-2030, 1999 WL 506979, at *2 (6th Cir. June 7, 1999).

Ford first takes issue with ALJ Lovitt's weighing of Dr. Dennis' opinion. (DN 13, at pp. 12-13). As noted above, Dr. Brandon Dennis, Psy. D. completed a one-time consultative examination of Ford in January of 2017 and documented his findings in a "medical source statement." (Tr. 647-650). His evaluation begins by discussing Ford's subjective complaints and psychiatric history. (Tr. 647-48). Dr. Dennis then observed Ford as being cooperative, engaged, articulate, and mostly attentive and able to concentrate, and as having positive and congruent affect, reasonable comprehension, a mostly linear thought process during the examination, and no clear evidence of responding to internal stimuli. (Tr. 649). Dr. Dennis also noted that Ford's mood was a bit "dysphoric" and that he was a bit unkempt. (Tr. 648-49). He further found that Ford's remote memory was sufficient for personal details and recent memory was mostly intact and that his baseline intelligence was estimated to be in the low average range. (Tr. 649).

Based on these observations and Ford's subjective complaints, Dr. Dennis concluded in a section titled "medical source statement" that Ford:

> would be expected to have moderate difficulty understanding, retaining, and carrying out one-two step and complex instructions. He could be expected to sustain concentration and persist in work-related activity at a reasonable pace with marked difficulty. He would be expected to have marked difficulty in his ability to maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the general public. His ability to tolerate the stress and pressure of daily work activity in a competitive setting is probably markedly to extremely limited overall.

(Tr. 650).

In his RFC determination, ALJ Lovitt thoroughly discussed Dr. Dennis' findings on exam and functional limitations before assigning "very little weight" to his medical source statement. (Tr. 29-30). ALJ Lovitt reasoned that Dr. Dennis' conclusions were "internally inconsistent with his own exam findings." Dr. Dennis' opined limitations, ALJ Lovitt explained, were

14

predominantly predicated on the subjective complaints and symptoms Ford put forth at the time of exam, rather than on the totality of objective evidence. ALJ Lovitt further noted that the basis for Dr. Dennis' "marked" and "extreme" limitations remains unclear "as these findings are not well explained and are otherwise unsupported by other relevant evidence." (*Id.*).

Ford argues that ALJ Lovitt's reliance on internal inconsistencies to discount Dr. Dennis' opinion was in error. (DN 13, at pp. 12-13). Ford defends that Dr. Dennis' direct observations support his conclusions, notably Dr. Dennis' observations that Ford was a bit unkempt, that his mood was dysphoric, and that he didn't have a basic fund of knowledge. Ford also cites to treatment records from other providers based on objective observations that he claims support Dr. Dennis' restrictive limitations. (*Id.* at p. 13 (citing Tr. 752, 1126, 1141)).

When evaluating the opinion of a non-treating, consultative examiner, an ALJ does not assess it for controlling weight. Instead, the opinion is evaluated using the factors set forth in 20 C.F.R. § 416.927(c). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). These factors include the examining relationship (or lack thereof), specialization of the physician, consistency of the medical opinion with the record, and supportability of the opinion. 20 C.F.R § 416.927(c)(1)-(6). An exhaustive factor-by-factor analysis is not required to comply with the regulations. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011).

ALJ Lovitt considered several of these factors in depth in discounting Dr. Dennis' opinion. For instance, Dr. Dennis had no treating relationship with Ford beyond his one-time consultative examination. As to supportability, the "marked" and "extreme" limitations opined by Dr. Dennis are simply not reflected in Dr. Dennis' objective exam. Other than noting Ford's mood was "dysphoric" and that his appearance was a bit "unkempt," Dr. Dennis' findings on mental status

exam were largely unremarkable. And Ford's dysphoric mood, unkempt appearance, and having no basic fund of knowledge do not alone establish Dr. Dennis' restrictive limitations. Dr. Dennis' observations that Ford was cooperative, engaged, articulate, and mostly attentive and able to concentrate during the exam are inconsistent with his conclusions that Ford is markedly limited at sustaining concentration and markedly limited at maintaining effective social interaction. It seems, instead, that Dr. Dennis formed his unsupported limitations by relying on Ford's subjective complaints regarding his condition. ALJ Lovitt properly considered these internal inconsistencies and Dr. Dennis' apparent reliance on Ford's subjective complaints in assigning very little weight to the medical source statement. *See, e.g., Amso v. Comm'r of Soc. Sec.*, No. 2:17-cv-11750, 2018 WL 4854110, at *9 (E.D. Mich. May 1, 2018) (citing *Remais v. Comm'r of Soc. Sec.*, 690 F. App'x 356, 357 (6th Cir. 2017) (finding reasonable the ALJ's decision to discount a medical opinion grounded on incredible subjective statements)).

Nor are Dr. Dennis' restrictive limitations consistent with other medical evidence in the record. Ford cites to medical records from Centerstone and from a therapist's evaluation that he claims are objective evidence supporting Dr. Dennis' findings. Although these records note that Ford was responding to internal stimuli (Tr. 752), that he had depressed mood and paranoid thought content (Tr. 1126), and that he was fairly distracted with impaired focus and attention (Tr. 1141), these records also note Ford's average intelligence and his progress with getting out of the house and easing his anxiety and voices. Moreover, the question is not whether evidence exists in the records upon which the ALJ could have found Ford disabled; it is whether the ALJ's decision that Ford is not disabled is supported by substantial evidence. *See Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Ford merely pointing to a few statements within the treatment records that support disability does not suffice. Because ALJ Lovitt thoroughly

considered the 20 C.F.R. § 416.927(c) criteria and because his assignment of "very little weight" to Dr. Dennis' one-time consultative evaluation was supported by substantial evidence in the record, the Court finds no error as to this finding.

Ford also takes issue ALJ Lovitt's statement that "there is no significant evidence to support an inability to perform simple, routine tasks involving few changes in the work day, no tandem tasks, and involving, at most, occasional interaction with others, and allowance to be off task up to 10% of the work day." This determination, Ford asserts, is false and is grounds for remand. (DN 13, at p. 11). In support, Ford cites to treatment records where he heard voices that worsened when he returned to work and where he reported he doesn't drive because he's paranoid and when he does drive, he gets lost. Ford also cites to a Daily Living Activities assessment, that he claims ALJ Lovitt relied on, that indicated Ford's mental impairments were moderately severe in communicating with coworkers and peers, maintaining productivity, and coping with stress. But, again, the evidence Ford relies on are his subjective reports to treatment providers. He doesn't point to any objective treatment records demonstrating that ALJ Lovitt's statement is false. ALJ Lovitt's brief citation to the Daily Living Activities assessment to support Ford's moderate level of impairment does not undercut his statement that there is no significant evidence to support his ability to persist during the workday.

Finally, Ford argues ALJ Lovitt improperly discounted Ford's testimony regarding the details of his auditory hallucinations and his ability to persist at the State Fair from the hearing by arguing that it contradicts Ford's treatment records. (*Id.*). ALJ Lovitt thoroughly discussed the treatment records of Ford's auditory hallucinations, noting first that Ford's description of the voices in his head as "loud/screaming" were only recently chronicled in late 2018. (Tr. 28). He went on to note that most of the other records detailed the voices as "whispering in nature" or "like

17

a TV in the other room." (*Id.*). ALJ Lovitt noted these descriptions seem to run contrary to Ford's hearing testimony that the voices were instructing him to "leave." (*Id.*).

Ford argues that any discrepancy between his hearing testimony and the treatment records is simply his lack of understanding of the vocabulary. (DN 13, at p. 9). Ford emphasizes that regardless of the apparent discrepancy, both his statements that his hallucinations are not "command" and that the voices sometimes tell him to "leave" or "get out" are corroborated by his treatment records. (*Id.*). The Commissioner responds that Ford's citing to selective treatment records does not invalidate ALJ Lovitt's determination that the majority of treatment reports have detailed Ford describing his voices as whispering.

ALJ Lovitt did not err in considering Ford's varying descriptions regarding the type and nature of his auditory hallucinations from the administrative hearing and from various treatment records. He made no finding that Ford was acting deceptively by providing inconsistent descriptions of his auditory hallucinations but instead merely noted that some of Ford's descriptions from the treatment records "seemingly run contrary to" Ford's testimony during the hearing. And while Ford is correct that the records from Seven Counties Services (Tr. 658) state that the voices tell him "leave get out," ALJ Lovitt's commentary on Ford's contrary testimony only refers to the treatment records that explicitly stated: "the voices do not give him instructions." In fact, Ford's highlighting of these select records bolsters the ALJ's finding that Ford gave different descriptions of his auditory hallucinations over time.

As to Ford persisting at the State Fair, ALJ Lovitt highlighted that an August 2016 exam report indicated that Ford reported his ability to go to the State Fair for four hours. (Tr. 28). ALJ Lovitt then noted this report's inconsistency with Ford's testimony during the hearing that he stayed at the Fair "about an hour and a half."  Ford clarifies that his testimony was not inconsistent

because he testified regarding the 2018 State Fair during the hearing, whereas, the treatment note was dated 2016. (DN 13, at pp. 13-14). The Commissioner acknowledges that ALJ Lovitt mistakenly compared two separate years where Ford attended the State Fair but asserts that such mistake was harmless because the ALJ gave several reasons why Ford's subjective complaints were inconsistent with his claims of disability. (DN 20, at p. 19). The Court agrees this mistake was harmless. ALJ Lovitt's commentary on Ford's State Fair attendance was just one consideration in his credibility determination. ALJ Lovitt also referenced Ford's ability to sustain concentration during the hour-long hearing, clinical records indicating Ford's resilience and progress with social interaction, and his inconsistent reports on his ability to drive in discounting the alleged severity in Ford's subjective complaints. (*See* Tr. 28-30).

## IV. Recommendation

For the above-stated reasons, the Court finds the Commissioner's decision is supported by substantial evidence in the record and complies with the applicable regulations. **IT IS THEREFORE RECOMMENDED** the Commissioner's decision be **AFFIRMED**.

January 7, 2021

Regina S. Edwards, Magistrate Judge
United States District Court

## NOTICE

Therefore, under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.  Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.  If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir.), *aff'd*, 474 U.S. 140 (1984).

Copies:          Counsel of Record